## Case No. 6,897.

### HUNT v. ROUSMANIER.

[3 Mason, 294.][1]

Circuit Court, D. Rhode Island. Nov. Term, 1823.[2]

EQUITY—ENFORCEMENT OF LIEN—MISTAKE OF LAW—RELIEF—INSOLVENT ESTATE.

1. A court of equity will not enforce an agreement for a lien or security for a debt, where the lien or security has failed by a mistake of law, against the general creditors of an insolvent estate.

[Cited in United States v. Cutts, Case No. 14,912.]

[See note at end of case.]

2. Nor will it direct a new security to be given, where an old one, chosen by the parties, has from a mistake of law become a nullity.

[Cited in Leavitt v. Palmer, 3 N. Y. 29, 39.]

3. Query, how far a court of equity will decree upon the proof by a single witness, where the answer puts the matter in issue, although only by a declaration of ignorance, &c., by administrators.

[Cited in Carpenter v. Providence Washington Ins. Co., 4 How. (45 U. S.) 218.]

After the decision of this cause [Case No. 6,898] an appeal was taken by the plaintiff [Clement S. Hunt] to the supreme court, and upon argument, the decree was reversed, and the cause sent back with liberty for the defendants [Louis Rousmanier's administrators] to withdraw their demurrer and to answer the bill. 8 Wheat. [21 U. S.] 174. The demurrer was accordingly withdrawn and an answer filed, upon which the parties were at issue, and the cause was set down for a hearing upon the whole evidence, and was argued shortly by the same counsel as were engaged at the former arguments.

The answer stated as follows: "These defendants," &c., "say, that they admit the loans of money mentioned in the complainant's bill, as evidenced by the promissory notes annexed to said bill, were made by the complainant to the said Rousmanier when in full life; that the said Rousmanier died on the 6th of May, 1820, leaving said notes unpaid, except as to the sum of $200 paid on the 11th of April, 1820. These defendants admit, that the two powers of attorney in the complainant's bill mentioned were duly executed. But they deny that the said Hunt took possession of the said vessels in said bill mentioned, to wit: the brig Nereus and schooner Industry. The attempt to do this was resisted by the defendants, as they believed themselves bound to refuse him the possession, and when the complainant advertised the said Rousmanier's interest in said vessels, and threatened to sell in the name of the defendants as administrators, these defendants forbade the sale. These defendants further answer and say, that, as to any agreement between the

---

[1] [Reported by William P. Mason, Esq.]

[2] [Affirmed in 1 Pet. (26 U. S.) 1.]

said complainant and the said Rousmanier, that the complainants should have specific security other than the said powers of attorney, on said vessels for said loans, they are entirely ignorant thereof, and are totally uninformed of the belief or intention of the said Rousmanier, as to the effect and efficiency of the said powers of attorney, otherwise than by the wording and import of the powers themselves. And the defendants, further answering, say, that they have heard and believe it to be true, that the complainant had, before the loan in said bill mentioned, agreed and engaged with the said Rousmanier to take a concern in a voyage in one of said Rousmanier's vessels, and that he, the complainant, on account of increasing doubts being entertained of said Rousmanier's credit and standing, and from advice of friends, declined being so concerned. That upon said Rousmanier's complaints and remonstrances on this account, and his representations, that it would disappoint and defeat the intended voyage, the cargo for which he had already ordered or purchased, the said complainant declared to the said Rousmanier, that no person should have just cause to complain of him for any breach of engagement; and, although he would not take the concern in the voyage, if the money would be of use to him the said Rousmanier, he, the complainant, would advance it on security, which offer said Rousmanier, accepted, and on his part offered to give the said complainant a bill of sale of the vessel, taking from said complainant a memorandum expressing the purpose for which said bill of sale was made, making it defeasible upon payment of the money loaned, which offer, on reflection, he the said complainant declined, assigning as a reason therefor, that he was unwilling his name should appear upon the ship's papers, which would subject him to trouble and to responsibility for the disbursements and supplies of the vessel, and perhaps to loss, by breach of revenue laws, or otherwise, and he preferred, and took, upon advice of counsel, the power of attorney to sell. And the said complainant, as these defendants have heard and believed, acted upon the same reason, motives, and advice, both as to the loan, of January 11th, and that of March 21st,—the one secured by the power of attorney to sell the brig Nereus, the other by the power to sell the Industry. And these defendants, further answering, say, that a clear bill of sale of said Rousmanier's interest in the brig Nereus, drawn in his own handwriting, conveying that interest to one William Bateman, was found by the defendants among the papers of the said Rousmanier, which bill of sale was dated the day before his death, and, as these defendants have heard and believe, was to have been executed and delivered on the evening of that day, which was prevented only by the necessity of said Bateman's speedy return to his family, living out of town, he agreeing to receive said bill of sale the next day. And these defendants, further answering, say, that the interest of the said Rousmanier in the Industry was sold by these defendants for less than said complainant demanded, for the security of which the power of attorney was taken, to sell his interest in that vessel. The defendants not being able to obtain more than $582.50, and subject to a commission of 2½ per cent. These powers of attorney state him to be the owner of three fourths of the Industry, whereas he was owner of but one-half. These defendants, further answering, say, that the estate of the said Rousmanier is greatly insolvent, and had been so for a considerable time before his death; that they fully believe that the said Rousmanier must have been conscious of his insolvency, and of their personal knowledge say, that he exerted himself in various rash and criminal modes to keep up his credit, and repel the suspicions of his insolvency. And they fully believe, that he never intended to make an actual open sale of said vessels to said complainant, as such a transfer of this, the greater part of his visible property, would, as these defendants believe, have entirely destroyed his credit and stopt his business. These defendants, further answering, say, that the complainant has exhibited and proved his demand, as by his bill of complaint set forth, before the commissioners of insolvency, duly appointed upon the estate of the said Rousmanier, and his dividend thereon declared, or to be declared, these defendants are ready to pay according to law. And these defendants, further answering, say, that they deemed it their duty as administrators to submit the demand of the said complainant for full payment of his demand aforesaid on the full value of said vessels, or the proceeds of their sale, and his asserted right to take and sell said vessels for his own benefit, to the opinion of counsel learned in the law, and thereupon they have been instructed and advised, that the powers of attorney aforesaid expired with the life of the author; that the said Hunt had no right by virtue thereof to take and sell said vessels, but they, as administrators, were bound to consider them as general assets in their hands, available for the creditors generally, and discharged of any lien in favour of said complainant, pretended to exist after the death of said Rousmanier. Therefore these defendants submit to the court, that they ought not to comply with the complainant's demand, but they are desirous to act in this matter under the directions and indemnity of this honourable court, without that," &c. &c.

The only evidence was contained in the two following depositions:

Deposition of Benjamin Hazard (counsel-

lor) swears, that the original power of attorney from Rousmanier to Hunt, dated the 13th of January, 1820, a copy of which is now shown to deponent as annexed to said Hunt's bill in equity against Rousmanier's administrators, was drawn by the deponent: that on the day said power was executed, said Rousmanier and Hunt came to deponent's office, and said Rousmanier then stated, that said Hunt had loaned or agreed to loan him, said Rousmanier, a sum of money upon security to be given by said Rousmanier on his interest in the brig Nereus: that he was desirous the said security should be as ample and available to said Hunt as it could be made: that he wished and was ready to give a bill of sale of the property or a mortgage on it, or any other security which said Hunt might prefer. This deponent further states, that both parties said to him, that they had called to request him to draw the writings and to get his opinion as to the kind of instrument, which would give the most perfect security to said Hunt: that this deponent then told said parties, that a bill of sale or a mortgage would be good security, but that an irrevocable power of attorney, such as was afterwards executed by said Rousmanier, would be as effectual and good security, as an absolute bill of sale or a mortgage, and would prevent the necessity of changing the said vessel's papers, and of said Hunt's taking possession of said vessel immediately upon her arrival from sea: that both said parties then requested this deponent to draw such an instrument as in his opinion would most effectually and fully secure said Hunt, and while this deponent was drawing said power of attorney, and after it was drawn and read to them, the said parties, said Hunt several times asked said deponent, if he was quite certain, that said power would be as safe and available to him, as a bill of sale or a mortgage; and that said power was then executed in consequence of the repeated assurances of this deponent, that it would be as extensive and perfect security, as an absolute bill of sale.—And deponent further states, that, from his knowledge of said Rousmanier, and of the situation he then was in, and from the earnest declarations and offers of said Rousmanier, he is, and then was, confident, that said Rousmanier would readily have given to said Hunt an absolute bill of sale of said property, or any other security that said Hunt would have asked; and from his knowledge of said Hunt, and his caution and declaration on that occasion, this deponent is equally confident, that said Hunt would not have accepted said power of attorney, had he not considered it as extensive and perfect security in all respects, as an absolute bill of sale. And this deponent further declares, that it was the understanding, meaning, and agreement of both said parties, that said Rousmanier's interest in said vessel should be, and was, absolutely pledged to said Hunt, and that he said Hunt should have, and did have, a specific lien and security thereon for the money loaned by him to said Rousmanier as full and complete and extensive, as if an absolute bill of sale thereof was given. Deponent further states, that before the execution of the second power of attorney, a copy of which is also annexed to said Hunt's bill, he the said Hunt again called upon him and told him, that he was about loaning a further sum of money to said Rousmanier, and asked, if deponent still remained in the same opinion he had before expressed, as to the validity and extent of security by power of attorney; to which deponent replied, that he still considered such a power to be equal in all respects to a bill of sale or a mortgage. Deponent is strongly impressed with the belief, that said Rousmanier called with said Hunt at the time last mentioned, and that he repeated the same offers which were made by him on the former occasion; but of this fact his recollection is not sufficiently distinct and clear to enable him to declare positively.

William Merchant deposes, that after the decease of Rousmanier, he was in the counting room of Rhodes, one of the administrators, &c., in company with said Hunt and Rhodes; in conversation between them, Hunt said that he had been induced by some representations made by said Rousmanier of his voyages, to engage in an enterprise in one of his vessels; that afterwards, in consequence of information received, he had altered his mind, and informed said Rousmanier thereof, who complained, and said, that in consequence of said Hunt's assurances, he, the said Rousmanier, had made purchases for the voyage, and incurred responsibilities; that he, the said Hunt, had replied to said Rousmanier, that no person should have cause to complain of him, the said Hunt, for any breach of, or non-compliance with, his promises, and that if the money would be of service to him, the said Rousmanier, he, the said Hunt, would let him have it, or loan it to him; that accordingly an agreement was made, by which said Hunt was to let Rousmanier have a sum of money, and said Rousmanier was to give him a bill of sale of a certain vessel, but that afterwards he, the said Hunt, reflected, that if he took a bill of sale, he would have to take out papers at the custom house in his own name, be subject to give bonds for the vessel, and perhaps made liable for breaches of law committed by him; that he, the said Hunt, consulted with Mr. Hazard upon the subject, who told him he could or would draw an irrevocable power of attorney to sell, which would do as well, or words to that import, which was accordingly done.

STORY, Circuit Justice. There is no longer any question, that the powers of attorney in this case, though irrevocable by the party in his lifetime, were revoked by his death, and that as instruments creating any lien or security for the debts due to the plaintiff, or any authority to sell, they are functi officio, and completely extinguished. This was clearly settled by the supreme court upon the appeal; and the very elaborate opinion of the chief justice, on that occasion, treats them as naked powers, containing no words of conveyance, and importing no assignment, and as having in the event totally failed in their object of subjecting the interest of Rousmanier in the vessels to the payment of the money advanced by the plaintiff on the credit of the vessels. 8 Wheat. [21 U. S.] 201, 202, 207. It must be taken then, that there is no lien now subsisting upon the vessels, either at law or in equity, which the court is called upon to enforce. The original bill, indeed, does not itself attempt to assert any lien as existing on the vessels by any direct allegation. It proceeds merely upon the ground, that the powers of attorney are subsisting securities, unextinguished and unextinguishable in their efficacy, and in virtue thereof it asks, that a sale of the vessel may be decreed, and the plaintiff paid the amount of his debts out of the proceeds. That ground is completely removed by the decision of the supreme court. The amended bill does not change this aspect of the case. It asserts no distinct agreement for a lien beyond what the powers of attorney actually created; but puts the relief upon the ground, that the parties acted under a mistake of the law, and for this cause it seeks to have a remedy in rem administered in equity in the same manner, as if the law had been, as the parties supposed it. So the bill was understood by the supreme court. The language of the chief justice is, that upon the amended bill, "it appears to the court to be a case, in which the notes, and powers of attorney, are admitted to be a complete consummation of the agreement. The thing stipulated was a collateral security on the Nereus and Industry. On advice of counsel this power was selected and given as that security. We think it a complete execution of that part of the agreement; as complete, though not as safe, an execution of it, as a mortgage would have been." 8 Wheat. [21 U. S.] 209. This language is too unequivocal to be misunderstood; and it is therefore an undoubted construction of the original and amended bill, that neither of them asserts an existing lien, which the law can recognize; or an agreement, which has not been punctually executed according to the choice and intention of the parties. The plaintiff's whole case now proceeds upon the notion, that the security selected by the parties has unintentionally failed of effect, and that there is a title to relief, not on account of an existing lien, or an omission to fulfill the agreement, but of a mistake of law, which has rendered the security taken a nullity. It is an attempt to substitute a new security in lieu of that, which has, unexpectedly to the parties, become extinct.

I think it necessary to present this view of the bill in a distinct shape, for the plaintiff can recover only secundum allegata et probata. The first consideration is, whether the case is made out in point of fact; the second, which I consider left entirely open by the supreme court, is, whether, upon the whole circumstances, the plaintiff is entitled in point of law to a priority or lien to be created in his favour against the general creditors in a case of insolvency. As to the facts, the testimony of the learned gentleman, under whose advice the parties acted, is direct to the matter of the bill, as I understand the import of the bill. I do not doubt, that he has stated the transactions with entire accuracy. But as he is a single witness in a case, where the answer puts in issue, though in a qualified manner, some of the material facts, if the cause rested solely on his testimony, I do not know, that it would, in a court of equity, be held absolutely sufficient for a decree. The testimony on the other side does however confirm it, as far as it goes. Construing the whole evidence together, it certainly does not establish an agreement for a lien or security different from that taken, but it tallies with the substance of the bill, and shows, that the powers of attorney were the chosen security, and a complete and intentional execution of the agreement. There is some difference in point of fact, as to the predicament of the case in respect to the two powers of attorney. It appears, that the first was given after the loan was actually made, the note being dated on the 11th, and the power executed on the 13th of January. But the second loan does not appear to have been made until after the execution of the second power on the 21st of March; and of course the precedent transactions could be, as to this, considered in no other light, than as mere proposals or negotiations for a loan on such security, as the plaintiff should choose to require. I think too, that the plaintiff's own evidence shows, that as to the second loan, the plaintiff made it upon the faith of the security so taken, and not upon any general agreement for an absolute lien de facto. If this posture of the facts ought to create a difference in point of law, in respect to the plaintiff's rights under the different agreements and powers, the defendants are entitled to the benefit. My opinion however will proceed upon a ground equally applicable to both.

Assuming then the bill to be established in its material facts by the proofs, how stands the plaintiff's case in point of law?

It is material to state, (and I repeat it,) that the question is not, whether a court of equity ought to enforce a subsisting lien; nor whether a court of equity ought to carry into effect an agreement for a lien, which has not been executed at all, or imperfectly executed, by the parties. The bill states no such case. So the supreme court considered it. The language of the court is, the money was advanced, the notes were given, and this letter of attorney was, on advice of counsel, executed and received, as the collateral security, which Hunt required. The letter of attorney is as much an execution of that part of the agreement, which stipulated a collateral security, as the notes are an execution of that part which stipulated, that the note should be given. 8 Wheat. [21 U. S.] 210. The real question now is, whether a court of equity ought "to direct a new security of a different character to be given, or direct that to be done, which the parties supposed would have been effected by the instrument agreed on between them." Id. The point formerly considered by the supreme court was, whether a court of equity could so do. In other words, whether it could give relief for a mistake of law, or only of facts. This is not a controversy between the original parties, where a subsisting security is sought to be enforced against the property, or against the person of the debtor, the property having been withdrawn by a bonâ fide sale, or otherwise, from the reach of the creditor. It is not a suit against the representatives of a solvent estate; nor against the assignees of a bankrupt, who are in law held liable to the same equities, as the bankrupt himself would be. Whatever may be the remedies in equity in such cases, (with which I meddle not) they do not necessarily govern the present. The court is dealing with a case of irretrievable insolvency, where all the bonâ fide creditors seek to enforce their just and equitable claims. In such a case the general rule is, that equality is equity. The original security is gone and extinguished by death. The plaintiff seeks to revive it, or rather to create a new permanent security in the property, where he has now none. Where is the equity, on which to found such a claim of priority or preference? Suppose no security had been given, and the plaintiff now sought by bill to enforce a lien on these vessels upon the footing of a contract for a lien, which by the death of Rousmanier was unexecuted. Would a court of equity now enforce it against other creditors in a case of insolvency? What preference has a contract for a lien in point of equity over a contract to pay a debt? If both are simple, unsealed contracts, there seems no reason, why non-performance of the one should be followed with different consequences from non-performance of the other. Securities actually given, often turn out unproductive; but does

that furnish a ground for creating a new one against other meritorious creditors? But the plaintiff's case is not so strong as that put. The agreement here was fully executed, and the required security given. It is gone; and the plaintiff asks to have relief against the creditors, because the party mistook the law, and imagined he had a security, which would endure notwithstanding the death of Rousmanier. He did not choose to take a bill of sale or a mortgage, because he feared a responsibility would be thereby incurred to third persons. He now claims, that the court should in effect give him what he rejected; that it should make him an assignee, or mortgagee, when he chose only to have a power to become the one or the other.

There is no case within my knowledge, where such relief has been granted against creditors of an insolvent estate, under circumstances like the present. The case of Mitchell v. Eades, Finch, Prec. 125, appears to me strongly the other way. There, the letter of attorney, which was to receive wages, was irrevocable, and the party, to whom it was given, was a creditor, which circumstance demonstrates (as I think), that it was given as security for the debt. The debtor died, and administration was granted to a third person, and the creditor brought a bill to have payment out of the wages. The court refused it against the rest of the creditors, and ordered the administrator to pay the debts according to the course of law, that is, to distribute the assets without any priority to the plaintiff. See same case, 2 Vern. 391; 1 Eq. Cas. Abr. 45. The case of Lepard v. Vernon, 2 Ves. & B. 51, recognizes the authority of Mitchell v. Eades, and proceeds upon similar principles. There, the testator executed a letter of attorney to Down & Co., who were the bankers of Goodacre & Buzzard, the latter being his creditors, to receive certain sums due him from the board of ordinance. There was parol evidence, that the letter of attorney was given to enable the bankers to apply the money to the payment of the debt of Goodacre & Buzzard. Down & Co. received sums under the power of attorney after the testator's death; and one of his executors made an assignment thereof to Goodacre & Buzzard, and gave them also a warrant of attorney to confess judgment against the goods of the testator. Two bills were brought, one by the other executors for an account, the other by Goodacre & Buzzard to enforce the priority of payment under their assignment, and the letter of attorney to Down & Co. Sir William Grant (the master of the rolls) said that the power of attorney was a common power, not accompanying any assignment of the debt, nor making part of any security given to the bankers; that though there was parol evidence, that the testator had declared it was to enable them to apply the money to the debt due to Goodacre & Buzzard; yet that

was not enough to operate as an appropriation of the money, or to prevent it from becoming part of the testator's effects. He therefore decreed against the bill of Goodacre & Buzzard, and ordered the money to be paid to the executors on their bill. Here, the learned judge absolutely refused to create a lien against the general creditors, where there had not been any assignment, although the intention of the parties was admitted, that the money should be applied to the payment of the debt.

When this cause was formerly before the court, the difficulty of maintaining the bill, as against creditors of an insolvent estate, did not so fully strike me in the light here presented, as it now does. Farther reflection on the subject has brought my mind to the conclusion, that if a mistake of law is to be corrected, or a parol agreement for a lien to be enforced against the party, it is not to be against other innocent creditors, standing upon equally meritorious considerations, and who, for aught we know, may have trusted to the ostensible, unincumbered ownership of Rousmanier in these very vessels for their security. My opinion proceeds upon these grounds; first, that the plaintiff has now no lien or specific security upon these vessels; secondly, that he has no equity to have such lien or security created against the other creditors of an insolvent estate. If an antecedent parol agreement had been set up in the bill for a general and absolute lien, I should have thought, that under all the circumstances of this case, where it was not admitted by the answer, it could not be established in equity upon the testimony of a single witness however respectable. Bill dismissed.

Decree. This cause came on to be heard upon the bill, answer and other pleadings, exhibits, and depositions in the case, and was argued by counsel. On consideration whereof, it is ordered, adjudged, and decreed by the court, that the plaintiff is entitled to no specific lien or security upon either of the vessels mentioned in the plaintiff's bill, and has no equity to be relieved in respect thereof, and that his bill be dismissed with costs to the defendants, without prejudice to his right to come in and receive a dividend of the said Rousmanier's estate, in common with the other creditors of the said estate.

[NOTE. An appeal was then taken by the plaintiff to the supreme court, where the decree was affirmed in an opinion by Mr. Justice Washington, who said that equity may relieve against a plain mistake arising from ignorance of law. But where parties, upon deliberation and advice, reject one kind of security, and agree upon another, under a misapprehension of the law governing the nature of the security chosen, a court of equity will not interfere. Much less will it do so when there are other creditors of an insolvent estate, whose equity is equal to that of the appellant. 1 Pet. (26 U. S.) 1. See, also, Cases Nos. 6,889 and 6,898.]