## MOWRY v. FARMERS' LOAN & TRUST CO.

(Circuit Court of Appeals, Seventh Circuit. October 5, 1896.)

### No. 313.

1. RAILROAD BONDS—SURRENDER—DEPOSIT UNDER REORGANIZATION AGREEMENT.

A reorganization agreement, providing for the refunding of securities, authorized a committee to carry out the reorganization, and recited that

It would probably not be necessary to sell the railroad, and disclaimed any power to affect the interests of nonassenting bondholders; and the mortgage made in accordance with the agreement to refund the securities provided that the bonds deposited under the agreement in exchange for the new securities should be held by the trustee under the mortgage as additional security for the benefit of the holders of the bonds secured thereby, and that upon delivery to the trustee of the bonds of any one issue still outstanding the mortgage securing them might be canceled. *Held,* that the bonds deposited under the agreement were not extinguished, so as to leave the nonassenting bonds the only outstanding debt secured by the existing mortgages.

**2. SAME.**

A clause of the reorganization agreement provided that a certain branch road, which was not remunerative, should be sold, the proceeds to be applied as the committee might determine. Such branch road was excepted from the new consolidated mortgage, but was not sold, owing to the failure of the reorganization, arising from the nonassent of certain bondholders. *Held,* that the assenting bondholders did not waive their lien upon such branch road in favor of the holders of the nonassenting bonds.

**3. RAILROAD BONDS—REISSUE—CONSIDERATION.**

The deposit of bonds by the holders with a trust company under a reorganization agreement, to be held by it as security for other bonds then issued by the railroad company, is not a reissue of the bonds, so as to be affected by Rev. St. Wis. § 1753, providing that no corporation shall issue bonds except for money, labor, or property equal to 75 per cent. of their par value.

On Appeal from the Circuit Court of the United States for the Eastern District of Wisconsin.

On the 1st day of September, 1881, the Green Bay, Winona & St. Paul Railroad Company executed to the Farmers' Loan & Trust Company a mortgage or trust deed to secure the payment of bonds amounting to $1,600,000. This mortgage covered the main line of railroad in Wisconsin, extending from Green Bay to the western terminus at Eastmoor, on the east bank of the Mississippi river, and a branch road extending from Onalaska to La Crosse, together with certain real estate in the last-named city. The bonds secured by this mortgage or trust deed were payable February 1, 1911, and bore interest at 6 per cent. per annum, payable semiannually on February 1st and August 1st. Default was made in the payment of the interest due August 1, 1888, and thereafter, on the 31st day of July, 1890, the trustee, by virtue of a provision in the trust deed, and being thereto requested in writing by the holders of one-fourth of the bonds secured by the mortgage or trust deed, took possession of the railway mortgaged, and entered upon the operation thereof; and thereafter, on the 1st day of August, 1890, filed its bill of complaint in the court below, setting forth the facts, and alleging the insolvency of the defendant railway corporation, and prayed that the trustee might be affirmed in its possession under the provisions of the trust deed, and that it be appointed receiver of the mortgaged premises, and might be instructed by the court from time to time with respect to the proper mode of fulfilling the provisions of its trust, that the amount due upon the bonds might be ascertained, and the property be sold in one parcel, and applied to the mortgaged debt. Upon filing the bill a decree was entered affirming the possession of the trustee, and appointing it receiver of the road, and thereafter and hitherto it has continued as its receiver.

In the year 1892 certain owners of the bonds sought to refund the indebtedness of the company. This refunding agreement was assented to and participated in by all of the first mortgage bondholders, with the exception of those owning 105 of such bonds. This agreement is in form a contract between three individual trustees, named, and such bondholders and stockholders of the railroad company as should deposit their respective holdings thereunder. It recited that there was outstanding $10,000,000 of common and preferred stock, $3,371,000 income bonds, refunded interest, and first mortgage bonds,

and $70,000 Green Bay, Stevens Point & Northern Railroad bonds. It provided that there should be issued, upon reorganization, the following securities: Consolidated 5 per cent. mortgage bonds, $2,500,000; second mortgage bonds, $3,781,000; noncumulative preferred stock, $2,000,000; common stock, $8,000,-000. The new consolidated bonds were to be used to take up at par the existing first mortgage bonds and unpaid coupons, the funded coupon bonds and unpaid coupons at par, and for other purposes. The holders of outstanding bonds were required to deposit their securities with the trust company, to be held and used for purposes of refunding under this plan, and temporary certificates were to be issued for securities so deposited. Clause X of the agreement provides: "It is not deemed probable that it will be necessary to carry out the contemplated reorganization agreement by a sale of the mortgaged premises under foreclosure. Nevertheless, any power to affect hereby the rights and interests of nonsubscribers is hereby expressly disclaimed; this agreement being made subject to any and all such rights and interests, whatever they may be." The agreement also conferred upon the committee "whatever power and authority it may be necessary for them to exercise in order to enable them legally and efficiently to execute such trust and carry out the reorganization herein contemplated," and by the fourth article declared: "Inasmuch as the branch line, seven miles in length, from Onalaska to La Crosse is twenty-two and one-half miles distant from the main line of the railroad, and its operation involves a net loss to the railroad company, therefore it is agreed that the said branch line and all property appurtenant to the same, and any and all other property, in the judgment of the committee, not needed for the operation of the railroad, may be sold at such time and in manner as the committee may determine, free of all claims of the subscribers and of the mortgage trustee, the proceeds to be applied as the committee may determine." The committee were to be the agents and trustees of the depositing bond and stockholders, and all bonds and shares of stock lodged in pursuance of the agreement were to be held by it, subject to the order of the committee, for carrying out the purposes of the agreement.

This reorganization agreement was signed and executed by holders and owners of bonds secured by the first mortgage to the amount of $1,495,000 of principal and of coupons in arrears to the amount of $334,320, by holders of bonds secured by the funded coupon agreement of the Green Bay, Winona & St. Paul Railroad Company, dated August 2, 1886, to the amount of $276,770 of principal and coupons thereof in arrears to the amount of $58,275, by holders of bonds secured by the first mortgage of the Green Bay, Stevens Point & Northern Railway Company to the amount of $69,000 of principal and coupons to the amount of $12,075. In pursuance of this refunding agreement, and on the 1st of August, 1892, the railroad company executed and issued its consolidated mortgage bonds of $1,000 each, aggregating the sum of $2,378,828, payable February 1, 1911, bearing interest at 5 per cent. per annum, payable semiannually on February and August 1st in each year, and, to secure the same, executed a certain consolidated mortgage or deed of trust, conveying to the Farmers' Loan & Trust Company the railway and its appurtenances, and provided by article XI as follows: "$1,600,000 (one million six hundred thousand dollars) of said bonds shall be used in exchange for outstanding bonds secured by the first mortgage of the Green Bay, Winona & St. Paul Railway Company to the Farmers' Loan & Trust Company, dated September 1, 1881, and shall be issued and delivered over by the trustee on the delivery to it of such outstanding bonds, dollar for dollar. $336,000 (three hundred and thirty-six thousand dollars) of said bonds shall be used in exchange for unpaid coupons of the said first mortgage bonds, secured by said mortgage of September 1, 1881, and shall be issued and delivered over by the trustee on the delivery to it of such unpaid coupons, dollar for dollar. $280,830 (two hundred and eighty thousand eight hundred and thirty dollars) shall be used in exchange for outstanding funded interest bonds secured by the mortgage of the Green Bay, Winona & St. Paul Railroad Company to the Farmers' Loan & Trust Company, dated August 2, 1886, and shall be issued and delivered over by the trustee on the delivery to it of such outstanding funded interest bonds, dollar for dollar. $50,549.40 (fifty thousand five hundred and forty-nine dollars and forty cents) of said bonds shall be used in

exchange for unpaid coupons of the said funded interest bonds, secured by said mortgage of August 2, 1886, and shall be issued and delivered over by the trustee on the delivery to it of such unpaid coupons, dollar for dollar. $70,000 (seventy thousand dollars) of said bonds shall be used in exchange for outstanding first mortgage seven per cent. bonds secured by the mortgage of the Green Bay, Stevens Point & Northern Railroad Company to the Farmers' Loan & Trust Company, dated August 15, 1882, and shall be issued and delivered over by the trustee on the delivery to it of such outstanding first mortgage seven per cent. bonds, dollar for dollar. $4,900 (four thousand nine hundred dollars) of said bonds shall be used in exchange for unpaid coupons of the said first mortgage seven per cent. bonds secured by said mortgage of the Green Bay, Stevens Point & Northern Railroad Company, and shall be issued and delivered over by the trustee on the delivery to it of such unpaid coupons, dollar for dollar. $157,720.60 (one hundred and fifty-seven thousand seven hundred and twenty dollars and sixty cents) of said bonds shall be at once certified and delivered over to the mortgagor railroad company on its order. The seven per cent. bonds secured by the mortgage of the Green Bay, Stevens Point & Northern Railroad Company, on being received in exchange as aforesaid, shall not be canceled, but shall be held by the trustee under this mortgage as an additional security for the benefit of the holders of the bonds secured by this mortgage. The bonds and coupons of prior issues of the Green Bay, Winona & St. Paul Railroad Company, received as above set forth, shall be held by the trustee under this mortgage as additional security for the benefit of the holders of the bonds secured hereby. But when the bonds and coupons outstanding of any one issue shall have been delivered over to the trustee, then the mortgage securing such bonds so delivered over, and for which bonds have been received in exchange as aforesaid, may, on the request of the railroad company, be canceled: provided, however, that no mortgage shall be canceled under the provisions hereof until the mortgage by the party hereto of the first part to the party hereto of the second part, known as the 'second income mortgage,' and dated September 1, 1881, shall have been previously satisfied and discharged."

This refunding agreement was sought to be carried into effect by the execution and delivery of new bonds and of a new mortgage. The trustee received the old securities of the company to the amount of the new bonds issued to the assenting bondholders. The railroad continued in the management of the receivership, however, and under it, and through the aid of the refunding proposed, a large quantity of steel rails were purchased, and the road and rolling stock much improved, prior to the panic of the year 1893. It thereafter appeared that the refunding scheme could not be carried out effectually, and in part because of nonassent of bondholders holding the 105 bonds represented here by the appellant. On March 1, 1895, William S. Mowry, the appellant, filed his bill in the court below as holding or representing the 105 nonassenting bonds, and sought the foreclosure of the first mortgage upon the road, and claimed that by participating in the reorganization agreement, and accepting consolidated bonds issued pursuant thereto, the 1,495 first mortgage bonds had become extinguished, leaving the 105 nonassenting bonds the only bonds secured by the first mortgage, and entitled to be first paid out of the proceeds of the mortgaged property. On the 5th day of March, 1895, the Farmers' Loan & Trust Company filed an amended and supplemental bill for the foreclosure of the second mortgage, and on the 10th day of April following filed a second amended and supplemental bill to foreclose the consolidated mortgage. On October 16, 1895, it filed an amendment to its amended and supplemental bill of March 5, 1895, and prayed for foreclosure and sale upon all the mortgages. These causes, by order of the court, were all consolidated. On the 14th day of November, 1895, the court, upon the motion of the Farmers' Loan & Trust Company, entered a decree of foreclosure and sale. This decree found that the entire issue of $1,600,000 of first mortgage bonds were outstanding in the hands of bona fide holders for value. The income mortgage of September, 1881, was adjudged to be a second lien, and the sum of $89,000 of outstanding consolidated bonds were adjudged to be a third lien, and $3,692,000 of new income bonds issued under the plan of reorganization was decreed to be a fourth lien. It was also decreed that the $1,495,000 of

first mortgage bonds and coupons deposited with the trust company to secure the bonds issued under the consolidated mortgage were not extinguished, but remained in full force and effect, and retained unimpaired the lien security provided by the first mortgage of September 1, 1881, except that the plan was treated as an agreement with the holders of the deposited $1,495,000 of bonds to accept an interest after August, 1892, at the reduced rate of 5 per cent. per annum. The decree further provided that upon the sale of the road, except as to a certain cash deposit and such sums as the court should require to discharge preferential claims, the balance of the accepted bid might be paid in money, or in first mortgage bonds and coupons, or in consolidated bonds and coupons; "each of the said first mortgage bonds and coupons to be taken at such price or value as the holder thereof would have been entitled to receive on the distribution of the proceeds of sale in case the entire amount of the bid had been paid in money, and each of such consolidated bonds and coupons to be taken at such price or value as the holders thereof would have been entitled to receive on the distribution of the proceeds of sale in case the entire amount of the bid had been paid in money, reckoning each of such consolidated bonds and coupons at an amount equal to the pro rata share of the holder of such consolidated bonds in the amount which would be payable out of the proceeds of the sale hereunder in case the entire amount of the bid had been paid in money, upon the first mortgage bonds and coupons deposited with the Farmers' Loan & Trust Company, as trustee, under the consolidated mortgage, in exchange for the issue of consolidated bonds, including the amount of first mortgage coupons deposited in exchange for funded coupon bonds, and which funded coupon bonds were thereafter exchanged for consolidated bonds, together with such sum as the holder thereof would be entitled to receive under the distribution herein ordered, and according to the priority of the said consolidated bonds herein adjudged." To this decree William S. Mowry, the appellant, filed assignments of errors, and from it has appealed to this court.

Henry Crawford, for appellant.

Edward P. Vilas and Geo. W. Wickersham, for appellees.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

JENKINS, Circuit Judge, after this statement of the case, delivered the opinion of the court.

Since this cause came to this court, provision was made by order of this court which would permit the complainant in the original decree to proceed to a sale of the railway thereunder, and providing that an amount should be paid into the court on the sale, which would fully protect the appellant here in case his claim should be sustained. We need not, therefore, stop to consider the various assignments of error which deal with certain alleged irregularities in the entry of the decree and its subsequent modification. The only matter with which we need concern ourselves is the contention of the appellant that by reason of the reorganization agreement, and the proceedings thereunder, the 1,495 assenting bonds were paid by the exchange for the new bonds issued under the consolidated mortgage, leaving the 105 nonassenting bonds the only outstanding debt secured by the first mortgage, and that the appellant, as the holder of these nonassenting bonds, is entitled to have them first paid out of the proceeds of the sale, and in priority to the assenting bonds. Whether this contention be well founded or not must, in large measure, depend upon the intention of the parties. It is manifestly true that it is possible that one holding bonds secured by a prior mortgage can so surrender them in exchange for bonds secured by a subsequent mortgage that he will lose

any right to the higher security. The question must be resolved in each case upon the facts of the particular transaction. Where a novation is thus sought to be established, it must be shown that the substitution of the new obligation was with design and intent to extinguish the old obligation; and as such an act would, upon its face, appear to be against the interest of the holder of the bond, such intent will not be presumed, but must be clearly established. A mere change in the form of the mortgaged debt, such as the substitution of new bonds for those originally secured by it, would not extinguish or affect the lien. Stevens v. Railway Co., L. R. 8 Ch. App. 1064. But where the new bonds are secured by a new mortgage, and the old bonds are surrendered to the debtor, generally a prima facie case would be established of novation when no purpose of the parties appeared to retain the elder security. Jones, Corp. Bonds, §§ 319, 320. The scheme of reorganization here involved is manifested by the agreement between the assenting bondholders and stockholders and their trustee or committee, and by the concurring act of the railroad company, manifested by the mortgage issued by it to effectuate the scheme. It was clearly expected that all the bondholders under prior mortgages and the stockholders would unite in this plan of reorganization; and yet, recognizing what oftentimes, and perhaps generally, occurs in the reorganization of railways, that some of the bonds might not be found, or that some holders would not assent to the scheme of reorganization, provision would seem to have been made to guard against just such a contingency, and to prevent the inequitable result which will follow if nonassenting bondholders should, by means of and through the reorganization to which they would not agree, obtain, with respect to the nonassenting bonds, a decided and inequitable advantage over assenting bondholders, who theretofore stood with them upon an equal plane. This thought, possibly, is not specifically expressed in the refunding agreement, but the committee was therein authorized to exercise all necessary power to efficiently execute the trust, and to carry out the reorganization; and the agreement recites that it was not deemed probable that it would be necessary, in order to effect the contemplated reorganization, that there should be a sale of the mortgaged premises under foreclosure, and it disclaimed any power to affect the rights and interests of nonassenting bondholders, and that the agreement was made subject to such rights and interests as they might have. The committee was also empowered to supply any defects and omissions in the agreement, and which it would be necessary to supply to carry out the purposes and objects of the plan; and any new bonds or mortgages necessary or expedient for that purpose should contain such provisions and contracts, not inconsistent with the agreement, as might be approved by the railroad company and by the trust company, to whom the mortgage might be made. These provisions clearly indicate that the discretion was lodged with the committee of the assenting bondholders to protect their rights in the consummation of the plan, and to insist upon such provisions as might be necessary to safeguard their interests. We therefore naturally find in the consolidated mortgage a provision that the bonds and coupons of prior issues of the railroad

company received in exchange should be held by the trustee under the consolidated mortgage as additional security for the benefit of the holders of the bonds secured thereby, and that, when the bonds and coupons outstanding of any one issue should have been delivered over to the trustee, then the mortgage securing such bonds so delivered over, and for which bonds had been received in exchange, should, on request of the railroad company, be canceled, and that no mortgage should be canceled until the second income mortgage had been satisfied and discharged. It is manifest that at this time the nonassent of certain bondholders was known to the committee of the railroad company and the trust company; that it was hoped they might be induced to concur, but that, in anticipation of nonconcurrence, provision must be made to maintain the equitable position and the parity of relation which the bondholders bore to each other; and that it was not designed that the bonds should be surrendered and exchanged in satisfaction of the mortgage debt, but that there should be reservation of the security attaching to the elder bond. There was, in fact, no surrender of these bonds to the railroad company; nor, indeed, can it properly be said that there was completed substitution. The legal effect of the transaction was that the assenting bondholder received the consolidated bond and held the prior bond, keeping both alive until the satisfaction of prior mortgages. This position is not weakened by the fact that the prior bond was delivered into the custody of the bondholders' trustee to hold for him and for his security until the final consummation of the plan of reorganization and the satisfaction of all prior mortgages, and until the consolidated bond should be the first and only lien upon the property. This was not a substitution of securities. It was an additional security, and "addition is not substitution." Bag Co. v. Van Nortwick, 9 U. S. App. 25, 3 C. C. A. 274, and 52 Fed. 752.

The appellant comes demanding of a court of equity that it shall exercise its equitable powers to compass an inequitable result. Holding a minority of the bonds, he declined to enter into this plan of reorganization. That he had a right to do; but he has not right, either moral, equitable, or legal, to say that through his nonassent he shall obtain so inequitable an advantage over the assenting bondholders. A court of equity would be slow to so construe any agreement of reorganization that it would work such unjust result. We find nothing in this agreement or in the act of the parties thereunder which even tends to that conclusion. The understanding seems to us to be express that the first mortgage, and the bonds issued thereunder, should be kept alive until all interests prior to the consolidated mortgage should be finally merged in the latter security, and all interests stand upon an equality of security under the plan of reorganization. We cannot entertain a construction of this agreement which would enlarge the rights of the appellant. There was no contract or agreement with him, and the contract between the assenting bondholders and the railroad company clearly contemplated the continued existence of prior securities. It was contemplated that to fully effectuate the reorganization it might be necessary to foreclose the prior mortgage, and, as observed by Judge Wallace in Barry v. Railway Co., 34

Fed. 829, 833, when it became necessary to enforce the mortgage securing the nonassenting bonds, "complete equity is done them if they are awarded the same share of the proceeds of the property which they would have received if no bonds had been surrendered." The conclusion we have reached is fully sustained in Ames v. Railway Co., 2 Woods, 207, Fed. Cas. No. 329; Fidelity Insurance, Trust & Safe-Deposit Co. v. Shenandoah Val. Ry. Co., 86 Va. 1, 9 S. E. 759; Ketchum v. Duncan, 96 U. S. 659. The case of Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434, 6 Sup. Ct. 809, is in no wise inconsistent. There was no contingency and no reservation on the part of those surrendering. As the court states, the surrender was for cancellation, and there was cancellation. That was a case of novation pure and simple.

Alike unfounded is the contention of the appellant that the court below erred in decreeing that the lien of the assenting bonds upon the La Crosse branch still existed, and that they should share in the proceeds arising from the sale of that branch. It is not correct to say that this branch road was, by the refunding agreement, or by any acts done thereunder or in pursuance thereof, released from the lien of the first mortgage. The clause of that agreement upon which the claim is rested merely provides that, as that branch road had no connection with the main line, and its operation was nonremunerative, and was not essential to the operation of the main line, the branch line should be sold when and as the committee should determine, and might be so sold free and discharged of all claims of the assenting bondholders, and that the proceeds should be applied as the committee might determine. It was not so sold. It is true that this branch road was not included in, and was expressly excepted from, the consolidated mortgage, and this was because, manifestly, that mortgage was executed in contemplation of the success of the refunding scheme, which designed a sale of the branch line and the appropriation of the proceeds to the uses of the main line, or for the benefit of the bondholders. That could not have been accomplished without the assent of all of the bondholders, and failed in consequence of the nonassent of some of them. The provision of the agreement was in aid of granting a clear title in the event of a sale, and was inoperative otherwise. It certainly was not within the purpose of the assenting bondholders to waive their security in favor of a stranger to the agreement, and surely a court of equity ought not to torture the language of the writing into an unconditional release of security, going to enrich a nonassenting bondholder.

It is further urged that the provision of the consolidated mortgage which authorized the trustee to hold the exchanged bonds and coupons as additional security for the benefit of the holders of bonds secured by the consolidated mortgage was an attempt to reissue, and a gratuitous pledge of the retired securities, within the prohibition of the statute. Rev. St. Wis. § 1753. This section is to the effect that "no corporation shall issue * * * any bonds or other evidences of indebtedness except for money, labor or property estimated at its true money value actually received by it, equal to seventy-five per cent. of the par value thereof, and all stocks and bonds issued con-

trary to the provisions of this section * * * shall be void."
This statute was considered and applied in National Foundry & Pipe
Works v. Oconto Water Co., 52 Fed. 29, 36; Pfister v. Railroad
Co., 83 Wis. 86, 53 N. W. 27. It was there held that the object of the
statute is to protect stockholders and bona fide creditors from im-
provident issue of bonds by a corporation, and that, when a corpora-
tion hypothecates its bonds as security for a loan, or for any other
purposes, or in any other manner, it issues them within the meaning
and intention of the statute; and, failing a stipulation that they shall
be accounted for at not less than 75 cents on the dollar of their par
value, the statute is violated, and the bonds are void. This exposi-
tion of the statute by the supreme court of Wisconsin is binding
upon us, and, were it not, we fully concur in the conclusion of that
court. The writer of this thus construed and applied it in the case
first cited, and before the decision by the supreme court of Wisconsin
referred to. This case, however, does not fall within the statute.
The first mortgage bonds were issue for value, and were valid obliga-
tions of the railroad company. They were never surrendered to that
company, and consequently they were never reissued by that com-
pany. It was not contemplated that they should be surrendered until
the happening of a contingency which has never occurred. They
were deposited by the holders with the trust company, to be held by
it as their security, or as security for other bonds then issued by the
railroad company. The company, by this mortgage, assented to the
transaction. This transaction is in no sense within the prohibition of
the law, nor does it come within the mischief sought to be prevent-
ed by the statute in question.

The decree will be affirmed.