## NICHOLS v. WAUKESHA CANNING CO.

(District Court, E. D. Wisconsin. April 2 and 19, 1912.)

1. CORPORATIONS (§ 474*)—PLEDGES—EFFECT OF TRANSACTIONS.

Where bonds of a corporation now insolvent were pledged to a bank, and though agreement was made that part of the bonds should be exchanged at par for notes held by the bank, the corporation paying a difference by check, the check was not cashed and the notes were not returned, and the bank is uncertain whether such part of the bonds are held as collateral or in absolute ownership, all the bonds must be regarded as pledged, on bill to wind up the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1854; Dec. Dig. § 474.*]

2. CORPORATIONS (§ 469*)—BONDS—VALIDITY—"MONEY, LABOR, OR PROPERTY."

Issuance of bonds by a corporation for antecedent debts not released is not issuance for "money, labor, or property," etc., within St. Wis. 1898, § 1753, which prohibits issuance for other purposes.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1832; Dec. Dig. § 469.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. CORPORATIONS (§ 469*)—VALIDITY OF BONDS—STATUTES—REPEAL.

The Wisconsin Negotiable Instruments Law (Laws 1899, c. 356) does not repeal or amend St. Wis. 1898, § 1753, which limits the purposes for which corporate bonds may be issued.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1832; Dec. Dig. § 469.*]

4. CORPORATIONS (§ 568*)—INSOLVENCY—DISTRIBUTION.

The maxim, "equality is equity," is generally applicable on distribution of an insolvent corporation's assets.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2288, 2289; Dec. Dig. § 568.*]

5. CORPORATIONS (§ 544*)—INSOLVENCY—EQUITABLE LIENS.

A mortgage given by a corporation now insolvent, under which bonds were issued for antecedent debts in violation of St. Wis. 1898, § 1753, cannot stand as an equitable lien in favor of holders of the invalid bonds who took them in consideration of a definite extension of time on notes or accounts held by them.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2162–2169; Dec. Dig. § 544.*]

In Equity. Bill by William H. Nichols against the Waukesha Canning Company, with cross-bill by First Savings & Trust Company, and answers thereto. Cross-bill dismissed.

Bloodgood, Kemper & Bloodgood and Miller, Mack & Fairchild, for First Nat. Bank of Milwaukee, First Savings & Trust Co., and others.

Merton, Newbury & Jacobson, for receivers and others.

Markham & Markham, for M. G. Madson Seed Co.

F. A. Geiger, for Hogg & Lytle.

T. W. Haight, for W. H. Grenell.

Bundy & Wilcox, for First National Bank of Rice Lake and others.

Kading & Kading, for Lowell Canning Co.

Tullar & Lockney, for Joseph J. Klock.

Jas. H. Dyer, for John L. Hamilton, surviving trustee, and others.

SANBORN, District Judge. This suit is a stockholders' bill brought for the winding up of defendant, the marshaling of its assets, and proper distribution among its creditors, on the ground of its insolvency and inability to further carry on its business. Receivers were appointed and have been in possession since May 18, 1910.

The questions now presented are raised by a cross-bill filed by the First Savings & Trust Company and the answers thereto. The cross-bill prays for the foreclosure of a trust deed made by defendant February 15, 1910, to secure its issue of bonds for $150,000, of which $123,500 are now outstanding. The answers of the defendant and the receivers allege that the bonds were issued and delivered without consideration, and in violation of section 1753 of the Wisconsin Statutes, reading as follows:

"No corporation shall issue any stock or certificate of stock except in consideration of money or labor or property, estimated at its true money value, actually received by it equal to the par value thereof, nor any bonds or other evidence of indebtedness except for money, labor, or property estimated at

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

its true value, actually received by it equal to seventy-five per cent. of the par value thereof; and all stocks and bonds issued contrary to the provisions of this section and all fictitious increase of the capital stock of any corporation shall be void."

About three months before the execution of the trust deed, meetings of all the creditors and the principal stockholders of the Waukesha Canning Company were held at Chicago, at which time the financial situation of the company was discussed and considered; at which meeting William Moore, W. H. Nichols, and Temple were appointed a committee to represent the creditors. William H. Nichols was made the spokesman of the committee, was to act in the matter under the direction of the committee and the directors of the Waukesha Canning Company, in providing ways and means to finance the operations of the company for the coming season. Pursuant to the understanding reached at these meetings, Merton, Newbury & Jacobson, counsel for the Waukesha Canning Company, were directed to take the necessary legal steps to authorize the execution of the mortgage on the real property of the company, as security for a bond issue of $150,000; the bonds to be used for the purpose of retiring the indebtedness, or to obtain extensions through collateralizing the bonds. Pending the disposition thereof, the American Appraisal Company was selected to appraise the property, and appraised the real property at substantially $400,000. Mr. Frank T. Stare, and Mr. C. S. Crary, who had been president and vice president respectively, and who had had the negotiations with the principal bankers to whom the company was indebted, were active in these negotiations leading up to the final consummation of the bond issue.

There was a preferred stock issue, and it was necessary to get the consent of three-fourths of the holders of the preferred stock. Such consent was obtained and provided that the bonds could be "either sold or used as collateral security" by the proper officers of the company under the direction and authority of the board of directors for the purpose of refunding the present indebtedness of the company or to provide new funds with which to prepare for the coming season's business. Thereafter and at an annual meeting of all the stockholders a resolution was adopted in substance as follows:

"That it is necessary that a large portion of the present indebtedness of this company be refunded and secured, and in order to refund such indebtedness and secure necessary extensions thereof, it is necessary that security therefor be given."

Therefore a mortgage was authorized in the sum of $150,000, "the terms, provisions and conditions, number and amount of such bonds, to be determined and fixed by the board of directors * * * to be either sold or used as collateral security by the proper officers of the company, under the direction and authority of the board of directors for the purpose of refunding present indebtedness of the company or to provide new funds with which to prepare for the coming season's business."

These proceedings were approved by the creditors' committee; of which two members, Mr. Moore and Mr. Nichols, were directors. Mr. Crary had been largely instrumental in obtaining the loans from

banks that were then outstanding, and the duty devolved upon him to conduct the negotiations with these banks. All of these banks were pressing the company for their money, were calling their loans, and refusing to renew them, and insisting upon payment or additional collateral security. With some of these banks, after it had been decided to issue the bonds, and pending the preliminaries necessary to accomplish the issue, Mr. Crary had agreed to put up bonds as collateral. Mr. Stare and Mr. Crary had consulted with Mr. Newbury, counsel of the company, prior to the issuance of any of the bonds, and prior to the delivery of any by the trust company to Mr. Stare, they had been advised of the statute in reference to putting out bonds for less than 75 per cent. of their par value. Mr. Crary and Mr. Nichols had been negotiating with Mr. Ingram, of Eau Claire, to make a sale of some of the bonds, and had other negotiations along this same line, but they were not able to promptly consummate them. Mr. Crary represented to the banks in personal interviews just what the situation was, and asked them to take the bonds at par, and in no instance at less than 75 per cent. of par, and he hoped to be able to take these down and pay up the loans; that they were well worth par, and that his understanding of the situation was that the parties to whom he gave the bonds would have to account for them at least at 75 per cent. of their par value; that they so understood the situation, although the parties with whom he negotiated, other than Mr. Bigelow of the First National Bank, were not familiar with the Wisconsin Statute; that his (Mr. Crary's) understanding was, and he thought the understanding of all the parties that he dealt with was, that he would have the right to take the bonds down at any time for the amount of what was due them, but they could not dispose of them for less than 75 per cent. of par.

Mr. Stare and Mr. Crary were president and vice president of the company, respectively, up to the 17th of March, 1910; and prior to that time, and pursuant to Mr. Crary's understanding of the matter, had delivered bonds to the Corn Exchange National Bank, the First National Bank, the State Bank of Hampshire, John L. Hamilton for the Citizens' State Bank, Lowell Canning Company, and Lewis E. Gary, of Chicago. At that date it was decided to put Mr. Nichols in control as president and manager. Mr. Stare and Mr. Crary wanted their acts in connection with the bonds put out formally ratified, and the situation was explained to Mr. Newbury and was approved by the directors and by the creditors' committee, and thereupon, and on the 17th of March, a resolution was adopted by the board of directors, under the terms of which the action of the officers in giving the bonds to the banks and parties named "as collateral security covering certain indebtedness is hereby ratified and approved"; and further that Nichols, as president, was specially authorized and empowered "(a) to dispose of the bonds of the company heretofore authorized for the benefit of the company and in such way and manner as he shall deem for the best interests of the company; (b) to liquidate, refund, renew or secure as the case may require or he shall deem for the best interests of the company, any or all of the present indebtedness of the company"; and that the specifying of the pow-

ers "shall not be considered or construed as in any way limiting the rights, power and authority of the said W. H. Nichols as president and general manager, as conferred and given him under the first paragraph."

After the adoption of the resolution of March 17, 1910, and in order to carry out the agreement that Mr. Crary had entered into prior to that time, Mr. Crary obtained from Mr. Nichols and caused to be delivered bonds to the Streator National Bank of Streator, to one Hamilton on behalf of the National Bank of Pawnee, People's Trust & Savings Bank of Streator; and pursuant to the same understanding and authority, either through Mr. Crary, Mr. Stare, or Mr. Nichols, bonds were delivered to Hogg & Lytle, City National Bank of Duluth, Columbus Canning Company, Columbus, Wis., Lowell Canning Company, Normanna Savings Bank, First National Bank of Columbus, Joseph J. Klock, Waukesha, W. H. Grennell, Saginaw, M. G. Madson Seed Company, Manitowoc, Wis., and also to D. M. Ferry & Company, Detroit (for which in this instance claim was made by D. M. Ferry Company that there was a present consideration), and to the American Appraisal Company, in which instance it is claimed that the bonds were taken in payment.

[1] The First National Bank of Rice Lake filed a preferred claim for $11,313.98, on promissory notes of defendant. It is alleged on behalf of the bank that defendant was indebted to it March 23, 1910, in the sum of $11,300 for the same debt now claimed, and at the time defendant delivered to the bank $11,500 of the bonds as collateral security. On April 20, 1910, it is claimed that the bank proposed to the defendant to accept $5,500, par value, of the bonds in place of two notes constituting part of the debt, and amounting to $5,650, and that the proposition was accepted, the bonds charged by defendant to the bank, and the balance of $150 offered to be paid by defendant's check sent to the bank. The bank, however, did not cash the check, nor return the notes. It is stated in the claim that the bank is uncertain whether it holds these bonds as collateral, or as owner, but that the balance of the bonds are held as collateral security. Under these circumstances, all the bonds held by the bank must be regarded as pledged, not sold. Clearly there was no novation, no exchange of securities, and these bonds are thus brought into the same class as all the others. Mowry v. Farmers' L. & T. Co., 76 Fed. 38, 22 C. C. A. 52, 46 U. S. App. 164, per Jenkins, Circuit Judge.

If the corporation, instead of issuing bonds secured by mortgage, had simply made a trust mortgage to secure such of its existing creditors as should accept the benefit of the mortgage and extend the time of payment, I have no doubt that the mortgage would have been a valid one. Power is expressly given to corporations by subdivision 7 of section 1748, Wisconsin Statutes, to mortgage their property to secure debts, or to borrow money for corporate purposes. So the mortgage in question is valid to the extent that any valid bonds were issued, if any there were, and if no bonds had been issued, but the transaction had taken the form of a mere mortgage security, as just suggested, such creditors as had accepted and extended maturity would

have been secured creditors. Section 1753 would have had no application, nor does any other statute prohibit the giving of such a security.

[2] The only real questions presented are whether the issuing of negotiable bonds for antecedent debts is the putting out the bonds "for money, labor or property estimated at its true money value, actually received" by the corporation; and if not, and the bonds therefore be held void, whether the bondholders should equitably be secured pro rata under the mortgage by reason of their diligence in pressing their claims and extending the time of payment of their respective debts. Literally considered these bonds are not within the statute, because they were not issued for money, nor for property estimated at its true money value. Existing debts are not money, and to say that they are property capable of estimation at its true money value does considerable violence to the words used. No property, claim, or debt was released or given up. Had the bonds been issued at the time of the respective loans, but for some reason the money not then paid over, subsequent payment of it might fairly be said to bring the case within the statute. The bonds would then be issued for money, as in the Kenosha Case they were issued for property. Haynes v. Kenosha Electric Co., 139 Wis. 227, 119 N. W. 568, 121 N. W. 124. Again, if the notes or claims had been given up and canceled, and the bonds taken outright at not more than four to three, another question would be presented. This might be held the purchase of property at not less than three-fourths of its true value. No such novation, however, occurred. The intent and purpose of the statute will be presently considered; but from the language alone it is clear to a demonstration that the issue of bonds for a pre-existing debt not surrendered is not covered. Pre-existing debts are neither money nor property capable of being valued unless actually given up. It is true that refunding bonds, substituted for existing valid bonds, are not within the statute. Mowry v. Farmers' Loan & T. Co., supra. This is because they add nothing to the prior bonded debt. They merely take the place of valid bonds already out.

In none of the transactions by which the bonds were pledged for the pre-existing debts was there anything paid on account of, or induced by, the delivery of the bonds. It was said by Judge Ross, of a constitutional provision of California similar to the Wisconsin Statute, in the case of Farmers' Loan & T. Co. v. San Diego St. Car Co. (C. C.) 45 Fed. 518, 528, that:

"The money paid, labor done, or property actually received must be paid, performed, or received, as the case may be, on account of the issuance of the bonds; and any bonds issued contrary to this provision are of course illegally issued. The provision does not mean, and cannot be held to mean, that such bonds may be issued as collateral security for any sort of pre-existing indebtedness."

It is entirely clear, I think, that if section 1753 means what it says, the bonds so pledged are void.

When the reason and purpose of the provision are considered, there is nothing to detract from the clear meaning of the language used, as just construed. In Pfister v. E. R. & L. Co., 83 Wis. 86, 53 N. W. 27, bonds for $250,000 were issued as security for a cash loan of

$125,000.   Chief Justice Lyon, delivering the opinion of the court, said:

"The object of the statute is to protect stockholders and bona fide creditors from the improvident issue of its bonds by the corporation. which might, and if allowed probably would, result in the wrecking of the corporation.   Hence the statute requires that no corporate bonds shall be issued unless the company shall actually receive therefor 75 per cent. of their par value.   When a corporation puts its bonds beyond its control by hypothecating them as security for loans, or for any other purpose, or in any other manner, it issues them, within the meaning and intention of the statute.   If it so hypothecates them without stipulating that they shall be accounted for at not less than 75 cents on the dollar of their par value, it violates the statute, and the bonds thus issued are void.   Any other construction would render the statute a dead letter, thus defeating all the wise and salutary purposes it was intended to accomplish.   Had the company sold Pfister the 250 bonds for $125,000, it would have been a safer transaction for stockholders and bona fide creditors of the corporation, for in that case nothing would have remained due to Pfister.   But now, if this transaction is upheld. Pfister may sell his remaining bonds for 25 cents on the dollar of their face value, or less, and thus leave due him a large debt from the company, while the company would remain liable for the full face value of the bonds.   No construction of the statute which would permit such evasion of its provisions can be tolerated."

The same rule was adopted by the Circuit Court of this district in National Foundry & Pipe Works v. Oconto Water Co. (C. C.) 52 Fed. 36, approved by the Circuit Court of Appeals of this circuit in the Mowry Case, already cited.   In Hinckley v. Pfister, 83 Wis. 64, 53 N. W. 21, it was held that neither the corporation nor stockholders could maintain a suit in equity for the surrender or cancellation of the bonds mentioned in the other Pfister Case cited, without offering to repay the $125,000 and interest.   The same rule was applied by the Circuit Court of Appeals of this circuit in Andrews v. National Foundry, 76 Fed. 38, 22 C. C. A. 52.

The true intent and purpose of the statute were to prevent the creation of corporate securities not representing actual value, and also to prevent the sacrifice of such value by summary sale of the bonds. Such sales of fairly good securities, which may have been pledged at the lawful rate of four to three, often result most disastrously to the debtor.   The bonds, put out at three-fourths their value, at forced sale bring 5 to 25 per cent. of their face.   This is applied to the debt, and the balance still stands against the debtor, plus the par value of the bonds sold.   The sale may thus nearly double the total indebtedness. It is said in argument that the language of the Wisconsin court in the Pfister Case, as to the necessity of an argument that pledged bonds shall be accounted for on the basis of at least three-fourths par, is a dictum, not necessary to the actual decision.   Possibly this is true, but its wisdom cannot be gainsaid.   If bonds can be pledged at 75 and then sold at 5, the restriction imposed by the statute is of no force.

While the aggregate indebtedness of the canning company was not increased by the pledges of these bonds, and the transactions do not come within the main purpose of the statute—injury to stockholders and the public—yet the language of the statute seems so clear as not to be overcome by any argument that a thing within the language of a statute is not within the statute unless covered by its spirit and pur-

pose, as held in Smythe v. Fiske, 23 Wall. 380, 23 L. Ed. 47. The language is peremptory, and clearly prohibits the pledge of corporate bonds for antecedent debts. Even if there had been an express agreement with every pledgee to account for the bonds at three-fourths their par value, they would still be invalid, because issued for a prohibited purpose.

A single question remains, one not mentioned on the argument, nor in the written briefs. That is whether, assuming the bonds invalid, their holders may be regarded as equitable assignees of the mortgage, in proportion to the par value of the bonds held by each. I am inclined to think that the mortgage is valid, because not issued entirely for a purpose prohibited by the statute. It was made to enable the officers to sell the bonds for money, pledge them for money, and to refund the debts. All these are lawful purposes. The board of directors ratified their use as collateral security to existing claims. The stockholders have no interest, because the corporation is hopelessly insolvent. Creditors only are concerned. Were the bonds valid, the creditors who hold them would be holders in due course, for value. They were diligent in pressing their claims, and the time of maturity was extended. Preferences actually existing at the time an insolvent estate is taken into court for distribution are always recognized by courts of equity, except under the bankrupt law. But preferences through legal proceedings after that time will not be permitted. By the state insolvent law (section 1693a) a preference made more than 60 days prior to a voluntary assignment is valid, as well as one made within the 60 days unless the creditor had reasonable cause to believe the debtor insolvent. None of these creditors had any cause for such belief.

The question therefore is: Would it be equitable to give these bondholders security in another form, as mortgagees rather than as bondholders secured by the mortgage? This question should not be decided without an opportunity to all parties to submit such written argument as they may think proper. They may file such arguments within two weeks, upon the question suggested, including that of the validity of the mortgage considered as a security for the bondholders' claims.

[3] The Wisconsin Negotiable Instruments Law (Laws 1899, c. 356), covering all sorts of negotiable paper, and being general in its scope, does not repeal or amend the special provision as to corporate bonds found in section 1753. There is also a strong presumption against repeal by implication. State ex rel. v. M. E. R. & L. Co., 144 Wis. 386, 129 N. W. 623, 140 Am. St. Rep. 1025.

[4, 5] When the foregoing opinion was written, it was thought that the mortgage might stand as an equitable lien in favor of such of the holders of the invalid bonds as had taken them in consideration of a definite extension of the time of maturity of the notes or accounts held by them, upon the ground that these creditors had been vigilant in attempting to secure their claims, had exercised forbearance which gave the corporation ample time to attempt to sell or pledge the bonds for money, and had enabled it to start the business for the season of 1910 which was prosecuted by the receivers. The

whole transaction being absolutely free from fraud, no discrimination between creditors appearing, the extensions of the time of maturity having been beneficial to the corporation and perhaps injurious to the bondholders, the latter might be regarded as equitable assignees of the mortgage in proportion to the bonds held by them. For this reason further argument was requested.

Further study and reflection, however, have convinced me that equitable rules do not justify the court in regarding the mortgage as a security in favor of those of the bondholders who made such extensions. The general rule of distribution depends on the maxim that "equality is equity." As a general rule this maxim governs all insolvent estates. All creditors are to be regarded as having equal claims unless some can show either a legal priority or a better equity. The chief difficulty, I think, in treating the mortgage as security for the bondholders, is that to do this would relieve against a mistake of law, pure and simple. In pledging these bonds both parties acted with the fullest knowledge of all the facts. The corporate officers put out the bonds knowing the terms of the statute, and the pledgees accepted them with like knowledge. The mistake made was in the mutual supposition that bonds pledged for antecedent debts would be valid. There was a misconception of the effect of the statute, and this was all; simply and wholly a mistake of law. It is fully settled, I think, in the decisions of the Supreme Court of the United States, that a mistake like this cannot be relieved. While a mistake of law in the making of a contract creates a basis for the interference of a court of equity in very exceptional cases, there seems to be nothing in the facts of this case to take it out of the general rule.

The leading case is Hunt v. Rousmaniere, 8 Wheat. 174, 5 L. Ed. 589. Rousmaniere owned an interest in two ships at sea, and Hunt loaned him $2,150, taking as collateral security two notes and two powers of attorney each authorizing Hunt to sell the ships to himself or any other person, and in the event of loss to collect the insurance money. It appears that the shipowner wished to fully secure Hunt for the loan, and was willing to give him a bill of sale or mortgage for that purpose. Hunt, however, wished to avoid the inconvenience of a formal transfer of the vessels, and the parties were advised by a solicitor to take the powers of attorney, which would do as well. Within a few months after the loan was made, Rousmaniere died, leaving an insolvent estate. Hunt filed his claim, and upon the arrival of the vessels took possession and attempted to sell them. The sale being forbidden, he filed a bill to compel defendants to join in a sale.

When the case first came to the Supreme Court it was held that the powers of attorney were naked powers, revoked by death. 8 Wheat. 174, 5 L. Ed. 589. But the case was remanded upon the point whether the invalid powers might be held good as equitable liens, so as to give Hunt priority over the general creditors of the estate. The case was heard at the circuit by Judge Story, as Circuit Justice, reported in 3 Mason, 294, Fed. Cas. No. 6,897. "The real question now is," said he, quoting the language of Chief Justice Marshall in the same case when before the Supreme Court, "whether a court of equity *ought*

'to direct a new security of a different character to be given, or direct that to be done which the parties supposed would have been effected by the instrument agreed on between them.'" 3 Mason, 304, Fed. Cas. No. 6,897. Justice Story held that the mistake of law could not be relieved against, and the case went to the Supreme Court on appeal, where the decree below was affirmed. It was held on appeal that the powers of attorney rendered void by the maker's death were taken by mistake as to their legal effect, and not by any mistake of fact, and that it would be unprecedented for a court of equity to decree another security to be given, different from that which had been agreed upon, or to treat the case as if such other security had, in fact, been agreed upon and executed. In the opinion it was said:

"If the court would not interfere in such a case, generally, much less would it do so in favor of one creditor, against the general creditors of an insolvent estate, whose equity is at least equal to that of the party seeking to obtain a preference, and who, in point of law, stand upon the same ground with himself."

The Hunt Case has been universally followed in the federal as well as the state courts, and only slightly limited, if at all, by the Supreme Court. Snell v. Insurance Co., 98 U. S. 85, 25 L. Ed. 52. Utermehle v. Norment, 197 U. S. 40, 25 Sup. Ct. 291, 49 L. Ed. 655, 3 Ann. Cas. 520; Griswold v. Hazard, 141 U. S. 260, 11 Sup. Ct. 972, 999, 35 L. Ed. 678. In the last case a bond to release defendant on a writ of ne exeat was given by Griswold, as surety, which, instead of stipulating for defendant's appearance, provided that he should abide and perform the orders and decrees of the court. Judgment being entered against defendant for a large sum, Griswold brought suit to cancel or reform the bond. The Supreme Court decided as a fact that all the parties intended the bond merely to secure the appearance of the principal, and that the case was one of a mutual mistake, clearly established, as to the legal effect of the instrument, a mistake as to the legal import of the terms employed to give effect to the mutual agreement. Griswold understood the word "perform" as implying performance in the sense of the principal's becoming amenable to the process of the court. It was further held that the concealment of the effect of the agreement from Griswold, who was not learned in the law, and a stranger to the principal, was, under the circumstances, a wrong to him. The court approved the rule laid down in Snell v. Insurance Co., supra, that:

"'A mere mistake of law, stripped of all other circumstances, constitutes no ground for the reformation of written contracts,' yet 'the rule that an admitted or clearly established misapprehension of the law does create a basis for the interference of courts of equity, resting on discretion and to be exercised only in the most unquestionable and flagrant cases, is certainly more in consonance with the best-considered and best-reasoned cases upon this point, both English and American.'"

Kleinmann v. Geiselmann, 114 Mo. 437, 21 S. W. 796, 35 Am. St. Rep. 761, is a case quite similar in its general features to the one under consideration. A mortgage was made to take up an earlier one. The mortgaged property was the subject of a devise by will, and the new mortgage was made by the widow instead of the devisees, through

a mistake of law in construing the will. The money advanced by the mortgagee was used to pay the earlier mortgage, and upon the later one being held void the person who advanced the money sought to be subrogated to the security of the first mortgage. It was held that equity could not relieve him, there being no circumstances of unfairness, fraud, or mistake of fact, simply a pure misapprehension of law. To the same effect is Capen v. Garrison, 193 Mo. 335, 92 S. W. 368.

All the cases cited were much stronger in their equitable circumstances than this one. Money was actually paid in all of them, which ought to justly have been repaid, except the Griswold Case. Here no money was paid, but extensions of time were given on the pledge of bonds made under a complete mistake of law. No circumstances of unfairness or misrepresentation, nor the slightest mistake of fact, anywhere appear from the evidence. According to established equitable principles, as I think, the mortgage cannot be regarded as an equitable security for the debts extended, and the cross-bill should therefore be dismissed.